# IN THE COURT OF APPEALS OF IOWA

No. 16-1340
Filed February 8, 2017

**TADD MATTHEW BERGAN,**
　　　Petitioner-Appellee/Cross-Appellant,

**vs.**

**MIRANDA HALL,**
　　　Respondent-Appellant/Cross-Appellee.
_____

　　　Appeal from the Iowa District Court for Scott County, Mark D. Cleve, Judge.


　　　Miranda Hall appeals and Tadd Bergan cross-appeals the district court's ruling and order on Bergan's petition for paternity determination, custody and support regarding their minor child.　**AFFIRMED ON APPEAL, MODIFIED IN PART ON CROSS-APPEAL.**

　　　Elizabeth A. Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des Moines, for appellant.

　　　Nathan M. Legue and Chase Cartee of Cartee & McKenrick, P.C., Davenport, for appellee.

　　　Considered by Danilson, C.J., and Vogel and Vaitheswaran, JJ.

**DANILSON, Chief Judge.**

Miranda Hall appeals and Tadd Bergan cross-appeals the district court's ruling and order on Bergan's petition for paternity, custody, and support regarding their minor child, M.B. Hall contends the district court should have placed physical care of M.B. with Hall. Hall also requests appellate attorney fees. Bergan asserts the district court improperly awarded Hall eight weeks of summer visitation, and requests the visitation schedule be amended to divide summer visitation equally between the parties. We find the district court's placement of physical care with Bergan and implementation of a liberal visitation schedule with Hall is in M.B.'s best interests. We therefore affirm on appeal. On cross-appeal, we modify in part to reduce Hall's summer visitation to six weeks in lieu of the eight weeks awarded by the district court.

**I. Background Facts and Proceedings.**

Tadd Bergan and Miranda Hall began their relationship in the fall of 2011 when Bergan was a twenty-one-year-old college senior attending Iowa State University (ISU) and Hall was a seventeen-year-old high school senior living in Grinnell. A few months after the start of the relationship Hall became pregnant, and M.B. was born in 2012. Although present for M.B.'s birth, Bergan did not stay at the hospital with Hall and M.B.

After M.B.'s birth, the parties resided together in an apartment in Grinnell. Hall served as the primary caregiver for M.B. while Bergan worked and continued taking classes at ISU. Bergan graduated from ISU in 2013 with a bachelor's degree in agricultural systems technology and was hired as a product

development specialist for John Deere. Despite the pregnancy, Hall also graduated on time in 2013 with her high school diploma.

Due to Bergan's job with John Deere, the parties moved to an apartment in Bettendorf in the summer of 2013. Bergan was required to "pay his dues" and traveled extensively in the first year of his employment. During this time, Hall continued acting as M.B.'s primary caregiver while also working part-time and attending classes at Scott Community College. The parties moved to a two-bedroom townhouse in Bettendorf in the spring of 2014. By December 2014 the parties' relationship had deteriorated. While back in Grinnell for the holidays, Hall decided she would not return to Bettendorf.

About two weeks later in January 2015, the parties agreed to a shared-care arrangement, with each party having M.B. every other week. Because he enjoyed the extra time with M.B., felt it provided more consistency, and wanted to allow his parents living in Grinnell to have time with M.B., Bergan voluntarily undertook the responsibility of providing transportation between Bettendorf and Grinnell each weekend to effectuate the visitation agreement.

After returning to Grinnell, Hall continued to take classes at Marshalltown Community College. Hall also began working as a certified nursing assistant at a local nursing home. Hall began a relationship with William Burnham in January 2015. Hall resided with her parents until March 2015, when she moved in with Burnham and his mother. Burnham is thirty-one and works for a company that performs hazardous materials tank testing, welding, and transportation. Burnham previously served eight years in the United States Marine Corps. Burnham has a conviction for public intoxication occurring in 2012 and three

operating while intoxicated (OWI) convictions from 2002, 2007, and November 2014. Burnham is required to have a breathalyzer device in his car and has a restricted license. Hall and Burnham built a two-bedroom home connected to Burnham's shop. They moved into the home in January 2016. The interior doors have not yet been installed in the home.

At the time of trial, Hall was twenty-two years old, continuing to take classes full time at Marshalltown Community College, and working at the nursing home part time every other weekend and some week days. Hall's annual income is $11,180. When Hall is attending school or working, she takes M.B. to a daycare or asks her mother or Burnham to provide care. Hall stated she will earn her licensed practical nurse certificate in May 2017. She then plans to obtain her registered nurse degree and begin working in the nursing field.

Bergan was twenty-six at the time of trial, still residing in Bettendorf, and working for John Deere. Bergan's annual income is $87,256. Bergan testified his required travel for work decreased significantly, and he will now be required to travel about three to four weeks each year. Bergan met and began dating Megan Zimmer in April 2015. The two are now engaged, although a wedding date is not set. Zimmer testified she and M.B. have a close relationship. Zimmer lives with Bergan and helps care for M.B. When M.B. is in Bergan's care, Zimmer feeds M.B. breakfast, gets M.B. ready for the day, and takes M.B. to daycare every day around 8:00 a.m. Bergan picks M.B. up around 2:30 p.m.

After trial held July 13 and 14, 2016, the district court entered its ruling and order on July 29. The court placed physical care with Bergan and ordered liberal visitation with Hall. Pursuant to the court's order, Hall is

> entitled to visitation with [M.B.] during the first three weekends of each month beginning at 5:00 p.m. on Thursday until 6:00 p.m. on the following Sunday, while the child is enrolled in preschool. When the child begins kindergarten, [Hall] shall be entitled to visitation with [M.B.] every other weekend beginning at 5:00 p.m. on Friday and ending at 6:00 p.m. on the following Sunday.
>
> . . . .
>
> [Hall] shall also be entitled to eight weeks of summer visitation, which may be exercised in one uninterrupted period if [Bergan] so chooses.

Hall was also given visitation during the week of M.B.'s spring break each year once M.B. begins school.

Hall now appeals the physical-care determination. Bergan cross-appeals the visitation schedule.

**II. Standard of Review.**

We review physical care and support determinations under Iowa Code 600B.40 (2015) de novo. *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995). We give weight to the fact findings of the district court, especially its determinations of witness credibility, but are not bound by them. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). "Our primary concern, of course, is the best interests of the child. Our objective is to place [the child] in the environment most likely to bring [the child] to healthy physical, mental, and social maturity." *Phillips*, 541 N.W.2d at 847.

**III. Analysis.**

*A. Physical Care.* Hall disputes the district court's determination that M.B.'s best interests are served by placement of physical care with Bergan.

"The criteria governing custody decisions is the same regardless of whether the parties are dissolving their marriage or are unwed." *In re Purscell*,

544 N.W.2d 466, 468 (Iowa Ct. App. 1995); *see also* Iowa Code § 600B.40 (providing that custody and visitation arrangements between parents who were never married are determined by the principles established in Iowa Code section 598.41). Iowa Code section 598.41 provides a list of nonexclusive factors we are to consider when determining what custody arrangement is in the best interests of the child. *In re Marriage of Hansen*, 733 N.W.2d 683, 697 (Iowa 2007). Such factors include: whether each parent is a suitable custodian; whether the child will suffer due to lack of contact with both parents; the parents' ability to communicate regarding the child's care; whether both parents have actively cared for the child before and during separation; each parent's ability to support the child's relationship with the other parent; the geographic proximity of the parents; and the safety of the child. Iowa Code § 598.41(3).

Due to the distance between their residences—Bergan lives in Bettendorf and Hall lives in Grinnell—the shared-care arrangement will be impossible once M.B. begins school. Both parents are competent and loving parents and have actively been involved in M.B.'s care from the start of the alternating weekly visitation schedule. However, both parents also have shortcomings.

The record reflects both parties did not communicate appropriately with each other. Although Hall did request the pick-up location to be changed to Burnham's mother's home in March 2015, she did not expressly inform Bergan of her move. Hall also did not include Bergan as an emergency contact with her daycare provider, listing Burnham instead.

During a week when M.B. was staying with Bergan's parents while Bergan was traveling for work, Bergan's parents utilized the services of a daycare

provider in Grinnell. In a conversation with the daycare provider, Bergan requested she "not pass around" the news that M.B. would be in her care to intentionally keep the information from Hall and Hall's parents. At trial, Bergan acknowledged it would have been proper to inform Hall who was caring for M.B. and to offer Hall the opportunity to care for M.B. during the times Bergan's parents placed M.B. in daycare. Bergan also did not inform Hall that he made an appointment for M.B. with a mental health counselor until about thirty minutes before the appointment began. Although Hall was upset about this and asked to be included in medical decisions, Bergan made a second appointment with the mental health counselor and did not give Hall proper notice.

The record also reflects neither party actively fostered a relationship with M.B. and the other party's parents.

Bergan's home is suitable for M.B. Hall's home will be suitable once interior doors are installed. However, after living in the home for approximately six months, Hall and Burnham had still not installed the doors, including doors to bathrooms and bedrooms, at the time of trial. With a young child in the home, the lack of doors and privacy is a concern.

The district court noted "it is very evident to the court both parties love M.B. and care deeply about her welfare." The court noted Hall was the primary caregiver for the first part of M.B.'s life, but that both parties acted as shared caretakers for more than the last year and a half prior to trial. Ultimately, the court determined Bergan "is better able to provide M.B. with stability, consistency, and permanency in her life." We note the district court, "which had an opportunity to view the demeanor of the witnesses when testifying," is better-

positioned to assess the parties' credibility. *See In re Marriage of Forbes*, 570 N.W.2d 757, 759 (Iowa 1997). We also acknowledge Hall's somewhat longer time period as the child's primary caretaker but, upon our de novo review, we agree that placing physical care with Bergan is in M.B.'s best interests.

Bergan and Zimmer provide a structured schedule for M.B., which ensures stability and consistency in M.B.'s life. Neither party questions Zimmer's ability to safely care for M.B. Hall testified she noticed improvements in M.B.'s clothing and hygiene since Zimmer began helping with M.B.'s care. However, although Burnham does not drive M.B. in his vehicle, his criminal and substance abuse history creates concern with Hall's decision to leave M.B. in Burnham's care for extended periods of time.

With the expectation that going forward Bergan actively communicates with Hall, includes Hall in decision-making regarding M.B.'s care, and fosters a relationship with Hall and Hall's parents, we conclude the district court correctly determined Bergan to be the appropriate physical-care placement.

*B. Visitation.* On cross-appeal, Bergan contends the summer visitation arrangement is improper. Bergan asserts he has never been away from M.B. for more than a week, and proposes summer vacation be divided equally.

"In establishing visitation rights, our governing consideration is, once again, the best interest of the chil[d]. In this regard, we have stated that, generally, liberal visitation rights are in the chil[d]'s best interest." *In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa 1992). Iowa Code section 598.41(1)(a) provides:

The court, insofar as is reasonable and in the best interest of the child, shall order the custody award, including liberal visitation rights where appropriate, which will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents after the parents have separated . . . and will encourage parents to share the rights and responsibilities of raising the child.

The evidence reflects Hall is an excellent and loving parent to M.B. Hall's work to maintain employment and complete her schooling while caring for M.B. is commendable. While the new custody arrangement will certainly be an adjustment for both parties, as well as for M.B., liberal summer visitation with Hall will allow M.B. to spend time with Hall necessary to allow for maximum continuing contact and to maintain the strong mother-child bond. We agree however, that eight weeks of visitation usurps nearly all of the child's summer vacation. In fact, with eight weeks of visitation, it would be difficult for Bergan to exercise his two weeks of uninterrupted time with the child. Accordingly, we reduce Hall's summer visitation to six weeks under the same terms otherwise imposed by the district court.

*C. Appellate Attorney Fees.* Hall also requests appellate attorney fees in the amount of $5000. "An award of appellate attorney fees is not a matter of right but rests within our discretion." *In re Marriage of Applegate*, 567 N.W.2d 671, 675 (Iowa Ct. App. 1997). "In determining whether to award appellate attorney fees, we consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013) (citation omitted). Because Hall is unsuccessful on appeal and Bergan is partially successful on cross-appeal, we

conclude an award of appellate attorney fees is not appropriate and deny Hall's request.

**IV. Conclusion.**

We find the district court's placement of physical care with Bergan and implementation of a liberal visitation schedule with Hall is in M.B.'s best interests. However, we modify the summer visitation to permit Hall six weeks of summer visitation in lieu of the eight weeks granted by the district court. We therefore affirm on appeal and modify in part on cross appeal.

**AFFIRMED ON APPEAL, MODIFIED IN PART ON CROSS-APPEAL.**